MICHAEL E. KIRBY, Judge,
h STATEMENT OF CASE
The State charged Donald Monroe with three counts of sexual battery in violation *629 of La. R.S. 14:43.1. He pleaded not guilty at his arraignment. Following a trial a unanimous six-member jury found him guilty of one count of sexual battery.
Mr. Monroe pleaded guilty to the multiple bill of information charging him as a second felony offender, and the court sentenced him to ten years at hard labor. That same day, the court granted the defendant’s Motion for Appeal. Some three months after the appeal had already been granted, the defendant filed a Motion to Reconsider Sentence.
Finding no merit in any of defendant’s three assignments of error we affirm his conviction and sentence.

STATEMENT OF FACT

Ms. Rochelle Hartman testified that in 2007 she worked as a forensic interviewer at Children’s Hospital in the Children’s Advocacy Center. She explained the specialized training, educational and occupational qualifications 1 required for her position. She stated that her services are utilized to obtain information from children who are victims of crimes. Her technique involves interviewing the child one-on-one, in a private, non-threatening environment and foster a positive rapport between her and the subject to quell any fear and apprehension the child may have. The room is sequestered from other areas of the facility and is equipped with video and audio recording equipment. While interviewing a child, Ms. Hartman is able to communicate with the investigating officer or social worker assigned to the case to obtain information pertinent to the officer’s/social worker’s concern(s).
Ms. Hartman explained that she interviewed M. P., the victim,[1] in October 2007. Prior to the interview, Ms. Hartman was not aware of any of the facts related to the case. The video and audio tape of her interview of the victim was played for the jury.[2]
Following Ms. Hartman’s testimony, the State introduced the defendant’s birth certificate, and the court allowed the jury to view it.
Detective Corey Lymous of the NOPD Sex Crimes Unit testified that in October 2007, he became aware of the alleged sexual battery of M.P. that occurred sometime in 2006. M.P. referred to the defendant by the alias “Romeo Johnson.” Through investigation, the detective determined that the defendant’s real name was Donald Monroe. With this information, Detective Lymous compiled a photo lineup, which he showed to the victim. She immediately identified the picture of the defendant and signed and wrote on the back of the picture, “That’s the person I |shad sex with.” The detective identified the photo lineup in court and verified the victim’s name and information on the back of the defendant’s photo.
On cross examination Detective Lymous stated that he got involved with this case because a young girl was pregnant. That case, however, involved a man named Derrick Pierre. The victim in this case told Lymous that she had penile/vaginal sex with the defendant on three occasions — in her aunt’s house, at Motel 6 and at the defendant’s FEMA trailer in November and December 2006. He also interviewed the victim’s grandmother who told him that she believed she heard the defendant in the victim’s bedroom on one occasion, but when she entered the room, she did not see him. The State introduced and *630 published to the jury copies of the victim’s and the defendant’s birth certificates.
The victim testified that she was fifteen at the time of trial and that she was in the ninth grade. Her aunt is her legal guardian because her mother is a drug addict, whom she rarely sees or hears from. The victim told the jury that she was thirteen years old in November 2006 when the defendant first contacted her. She referred to the defendant as “Romeo Johnson” and said that he got her telephone number from her mother. The victim received a telephone call from the defendant, and then he showed up at her aunt’s house and they spoke. Later that night, the defendant came to her house, and the two had sex. Her aunt was not at home that night.
The next time she had sex with the defendant was around Christmas 2006, again in her bedroom at her aunt’s house. That night the victim’s great-grandmother was in the house visiting for the holiday. The defendant entered her bedroom window, and they had sex. While the two were in the bedroom, her grandmother knocked on the door. The victim refused to open the door until her |4grandmother began fussing and demanding that she open the door. The defendant hid in her closet, so that when the grandmother opened the door, she did not see him. After that, the defendant and the victim left the house and went to a hotel where they had sex again for a few hours. The victim returned home in the early morning hours before her aunt returned from work about 7:00 a.m. On another occasion, the victim and the defendant had sex in the defendant’s trailer.
The victim stopped seeing the defendant in early January of the next year when she received an irate phone call from the defendant’s girlfriend, Jennifer. The victim said she became pregnant in 2007[3] and gave birth to her daughter on November 25, 2007. When her aunt discovered that she was pregnant, her aunt called the police and learned from the victim that she had been seeing the defendant. Her aunt confronted the defendant at his house in the presence of the defendant’s brother, a friend and another woman. Thereafter, the victim went to the Children’s Advocacy Center where she was interviewed by a counselor. The victim reported to the counselor that she was pregnant and had started seeing Derrick Pierre after her relationship with the defendant ended. Sometime in the summer of 2008, the victim viewed a photo lineup from which she identified the defendant. She identified her signature on the back of the defendant’s picture. She also identified the defendant in court as “Romeo,” the man she had sex with in 2006.
L.P., the victim’s aunt/guardian, testified that she found out that the victim was pregnant in the fifth month of the pregnancy. The victim gave birth to a daughter in November 2007. When L.P. learned of the pregnancy, she demanded | ¡¡that the victim give her details — what happened, when and with whom. L.P. said that the victim never sees either of her parents— her mother is a homeless drug addict and her father lives in Baton Rouge.
L.P. learned that the victim had had sex with the defendant. She had the victim direct her to the defendant’s home on America Street where L.P. confronted him, telling him that she had heard that he had sex with her thirteen year old niece. Initially, the defendant denied the allegation, but L.P. told him he might as “well fess up” because she had notified the police. The defendant admitted that he had *631 been to L.P.’s house and had sex with the victim. The defendant pleaded with the victim to explain to her aunt how their relationship began — that the victim’s mother had given him the victim’s phone number and address. The defendant’s girlfriend, Jennifer, his younger brother and another relative were present when L.P. confronted the defendant. L.P. identified the defendant in court as the man she learned had had sex with the victim.
The year after the confrontation, L.P. noticed the defendant ahead of her in the check out line at Winn Dixie. Up to that time, the police had not been able to ascertain the defendant’s real name, so when she saw him at the Winn Dixie and recognized his tattoos, she called the police. When the defendant left the store, officers stopped and questioned him as a result of L. P.’s identification of him as the man who had sex with her niece. She did not hear the questioning, and the police did not arrest the defendant that day.
Jennifer Alexander, the defendant’s girlfriend, testified that she and the defendant began dating in November 2003, and that he has numerous tattoos on his body including her name on his chest and wedding ring finger. Since she has known him, the defendant and his father, Donald Monroe, Sr., and his godbrother, | (¡Louis, travel to Washington, D.C., a few days prior to Christmas to visit his mother for the holidays. Ms. Alexander testified that she was certain the defendant was visiting his mother for Christmas 2006, and that she spoke to both the defendant and his mother at his mother’s residence in Washington, D. C., on that day.
Ms. Alexander said that she was at the defendant’s house the day L.P. confronted the defendant. L.P. drove up to the house asking for “Romeo Johnson”, a name Ms. Alexander had never heard before, and not a name she or anyone else ever called the defendant. The defendant’s nickname is “Toot”. L.P. was combative, attempting to provoke an altercation, cursing at her and accusing her of calling the victim on the telephone. Ms. Alexander denied L. P.’s accusations and added that it was the victim who kept calling the defendant’s cell phone and harassing them. L.P. also yelled at the defendant, saying that he had had sex with the underage victim, and that she was going to notify the police. Ms. Alexander heard the defendant deny knowing the victim and saying he had never had sex with her. At the time this incident occurred, the victim was sitting in the back seat of L.P.’s car.
Louis Scott, the defendant’s twenty year old cousin, testified that it was customary for him, the defendant, the defendant’s father and other relatives to drive to Washington, D. C., to visit the defendant’s mother, Tawana Monroe, for the Christmas holidays. He specifically remembered being in Washington with the defendant and other family members on Christmas Eve 2006. They left New Orleans a few days before Christmas 2006 to drive to Washington. Mr. Scott corroborated Ms. Alexander’s testimony that the defendant has numerous tattoos on his body and that he goes by the nickname “Toot.” Mr. Scott denied knowing L.P. and the victim.
|7The defendant testified that he and Jennifer Alexander have been dating for several years. He said that he has always been loyal and faithful to her. He admitted having numerous tattoos on his body and even exhibited his back and chest for the jury to see. He testified that all of his tattoos pre-dated Hurricane Katrina, and that he has not gotten any more since that time. He explained that he was able to get tattoos before he turned eighteen because he was responsible for himself, even though he lived with his father. The defendant affirmed his cousin’s testimony *632 that he and other family members always drove to Washington, D.C. to be with his mother for Christmas, and that the same was true for Christmas 2006. He and his family would routinely return to New Orleans just before New Year’s Day.
The defendant said that in the fall of 2006, he met the victim’s mother at a bus stop. He was in his car at the traffic light when the victim’s mother approached him and asked him to drive her to Winn Dixie to pick up a birthday cake. When she offered him $20.00 for gas, he agreed to her request because he wanted to help her. The woman did not look like a homeless or penniless drug addict. After she exited the store with the cake, he drove her to her house on Crowder Blvd. There he met the victim, who he could see was underage and much too interested in him. He gave the victim’s mother his telephone number as he left the house, and that is probably how the victim knew to call him on his cell phone. He categorically denied having sex with the victim at any time. The victim probably recognized him and his cousin, Louis Scott, from Livingston School, which she and his cousin attended. On many occasions, the defendant would drive his cousin to and from school. He had no idea why the victim would make up the stories of having sex with him on various occasions and places. He would never |8have sex with an underage girl, and he denied being known by the name “Romeo Johnson.” He said “Toot” is his nickname.
He remembered the day L.P. drove to his house on America Street and accused him of having raped the victim. L.P. was angry, screaming and yelling, threatening to turn him into the police. He assured L.P. that he had never been with the victim, and he could not understand why she would accuse him of a crime. In spite of L. P.’s threats to turn him into the police, he never left town to avoid prosecution. Even after the police detained and questioned him at Winn Dixie, and subsequently released him, he never feared being in trouble because he knew L. P.’s accusations were false.

ERRORS PATENT

A review for errors patent on the face of the record reveals one. The record does not indicate that the trial court ruled on the defendant’s Motion to Reconsider Sentence; however, there is no error because the defendant filed the motion more than thirty days after sentencing in derogation of C.CrJP. art. 881.1.[4]

ASSIGNMENT OF ERROR NUMBER 1

The defendant’s first assignment of error argues that his conviction on count two is duplicitous of his acquittal on count one. Therefore, his conviction on count two violates the constitutional prohibition against double jeopardy.
| aThis assignment is without merit because the defendant herein was not subjected to double jeopardy.
The bill of information in this case charged the defendant with three counts of sexual battery upon the victim. Counts one and two of the bill of information both charged the defendant with committing the crime within the date range of November 1, 2006, through November 30, 2006. As such, the defendant contends, his acquittal on count 1 renders him ineligible for prosecution on count two because of double jeopardy.
*633 Double jeopardy provisions protect an accused not only from a second prosecution for the same offense, but also multiple punishments for the same criminal act. U.S. Const. amend. V; La. Const. art. 1, § 15; La. C. Cr. P. art. 591; State v. Knowles, 392 So.2d 651 (La.1980).
The two tests used by Louisiana courts when examining double jeopardy claims are the “distinct fact” of the Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932) test and the “same evidence test.” State v. Steele, 387 So.2d 1175 (La.1980). The Blockburger test determines whether each crime requires proof of an additional fact which the other does not. If multiple charges are double jeopardy under Blockburger, then the inquiry need go no further, since the constitutional prohibition against double jeopardy will have been abridged.
However, if there is not a finding of double jeopardy under the Blockburger test, then the court must look to Louisiana’s “same evidence” test to see if the state’s greater protection is implicated. The Louisiana definition of double jeopardy test is contained in La. C. Cr. P. art. 596, which states:
Double jeopardy exists in a second trial only when the charge in that trial is:
1 in(l) Identical with or a different grade of the same offense for which the defendant was in jeopardy in the first trial, whether or not a responsive verdict could have been rendered in the first trial as to the charge in the second trial; or
(2) Based on a part of a continuous offense for which offense the defendant was in jeopardy in the first trial.
The “same evidence” test is articulated as: if all the evidence required to support a finding of guilt of one crime would also have supported conviction of the other, the two are the same offense under a plea of double jeopardy, and a defendant can be placed in jeopardy for only one. The test depends on the evidence necessary for conviction, not all the evidence introduced at trial. State v. Steele, supra. The “same evidence” test is broader in concept than Blockburger, the central idea being that one should not be punished (or put in jeopardy) twice for the same course of conduct. State v. Steele, supra.
In this case, the defendant was charged with one crime — sexual battery — but three counts of that crime, i.e. three distinct and separate events. Counts one and two are alleged to have been committed during the time frame of November 1, 2006, through November 30, 2006, even though the date range is not essential to the crimes charged and thus was not necessary. See La.C.Cr.P. 468.[5] The victim testified that one of the November sexual encounters with the defendant occurred in the victim’s bedroom at her aunt’s house. The second episode, occurring |nsometime later in the month, began in the victim’s bedroom but concluded in a hotel room.
When different acts violate the same statute, the test of whether the of *634 fender has committed one or several offenses simply “ ‘is whether the individual acts are prohibited, or the course of action which they constitute. If the former, then each act is punishable separately. * * * If the latter, there can be but one penalty.’ ” Blockburger, 284 U.S. at 302, 52 S.Ct. at 181 (quoting Wharton’s Criminal Law (11th Ed.) § 34, n. 3) (citing by example prosecution on several counts of willfully tearing mail bags with intent to rob “... the offense as to each separate bag was complete when the bag was cut, irrespective of any attack upon, or mutilation of, any other bag.”) (internal quotation marks and citation omitted). State v. Murray, 2000-1258 (La.9/18/01), 799 So.2d 453.
Neither Blockburger nor the “same evidence” rule supports the defendant’s assertion of double jeopardy. The defendant was charged with committing the crime of sexual battery on three distinct occasions, each punishable separately. Mr. Monroe was never placed in double jeopardy. This assignment is without merit.

ASSIGNMENT OF ERROR NUMBER 2

In a second assignment of error, the defendant argues that the evidence is insufficient to support his conviction. He maintains that the victim made up her entire story as part of an elaborate fantasy-
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, in viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have lis-found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Cummings, 95-1377 (La.2/28/96), 668 So.2d 1132. A reviewing court must consider the record as a whole, as would any rational trier of fact. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. State v. Mussall, 523 So.2d 1305 (La.1988). The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall, supra. A reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence. State v. Smith, 600 So.2d 1319 (La.1992).
In order for the defendant’s convictions to be upheld, the record must establish that the State proved beyond a reasonable doubt all the essential elements of sexual battery, which La. R.S. 14:43.1 defines as:
A .... the intentional engaging in any of the following acts with another person where the offender acts without the consent of the victim, or where the act is consensual but the other person, who is not the spouse of the offender, has not yet attained fifteen years of age and is at least three years younger than the offender:
(1) The touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender; or
(2) The touching of the anus or genitals of the offender by the victim using any instrumentality or any part of the body of the victim.
B. Lack of knowledge of the victim’s age shall not be a defense. However, where the victim is under seventeen, normal medical treatment or normal sanitary care of an infant shall not be construed as an offense under the provisions of this Section.
113In this case, the victim testified that she had consensual sexual intercourse with the defendant on three occasions in 2006, *635 when she was only thirteen years old. The State introduced a copy of the defendant’s birth certificate, which proved that he was more than three years older than the victim at the time of the offenses. Moreover, the fact that the victim and the defendant were not married was proven by circumstantial evidence. Therefore, the testimony at trial was sufficient to prove that the defendant intentionally engaged in acts wherein his genitals touched the thirteen year old, non-spouse victim. This assignment has no merit.

ASSIGNMENT OF ERROR NUMBER 3

In his final assignment, the defendant complains that his ten year sentence is excessive.
There was no objection when sentence was imposed, and counsel untimely filed the Motion to Reconsider of Sentence. Accordingly, we find that this assignment was not preserved for appeal. However, for the sake of judicial economy and in the interest of justice we have considered it and find it, likewise, to be without merit.
In State v. Smith, 2001-2574, p. 7 (La.1/14/03), 839 So.2d 1, 4, the Court set forth the standard for evaluating a claim of excessive sentence:
Louisiana Constitution of 1974, art. I, § 20 provides, in pertinent part, that “[n]o law shall subject any person to ••• excessive ••• punishment.” Although a sentence is within statutory limits, it can be reviewed for constitutional excessiveness. State v. Sepulvado, 367 So.2d 762, 767 (La.1979). A sentence is unconstitutionally excessive when it imposes punishment grossly disproportionate to the severity of the offense or constitutes nothing more than needless infliction of pain and suffering. State v. Bonanno, 384 So.2d 355, 357 (La.1980). A trial judge has broad discretion when 114imposing a sentence and a reviewing court may not set a sentence aside absent a manifest abuse of discretion. State v. Cann, 471 So.2d 701, 703 (La.1985). On appellate review of a sentence, the relevant question is not whether another sentence might have been more appropriate but whether the trial court abused its broad sentencing discretion. State v. Walker, 00-3200, p. 2 (La.10/12/01), 799 So.2d 461, 462; cf. State v. Phillips, 02-0737, p. 1 (La.11/15/02), 831 So.2d 905, 906.
An appellate court reviewing a claim of excessive sentence must determine whether the trial court adequately complied with the statutory guidelines in La.C.Cr.P. art. 894.1, as well as whether the facts of the case warrant the sentence imposed. State v. Landry, 2003-1617 (La.App. 4 Cir. 3/31/04), 871 So.2d 1235; State v. Trepagnier, 97-2427 (La.App. 4 Cir. 9/15/99), 744 So.2d 181. However, as noted in State v. Major, 96-1214, p. 10 (La.App. 4 Cir. 3/4/98), 708 So.2d 813:
The articulation of the factual basis for a sentence is the goal of Art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, resentencing is unnecessary even when there has not been full compliance with Art. 894.1. State v. Landos, 419 So.2d 475 (La.1982). The reviewing court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. La. C.Cr.P. art. 881.4(D).
If the reviewing court finds adequate compliance with La.C.Cr.P. art. 894.1, it must then determine whether the sentence the trial court imposed is too severe in light of the particular defendant as well as the circumstances of the case, “keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged.” State *636 v. Landry 2003-1671 at p. 8, 871 So.2d at 1239. See also State v. Bonicard, 98-0665 (La.App. 4 Cir. 8/4/99), 752 So.2d 184.
The defendant was sentenced as a second felony offender and as such faced a sentencing range of five to twenty years. The trial court imposed a ten year | ^sentence. In sentencing the defendant, the trial judge noted that he was an adult taking advantage of an impressionable thirteen year old child. The judge further noted that the defendant “had a girlfriend at home, a very beautiful self possessed, self-employed person living with [him]” and that there was no excuse for his behavior. Moreover, the judge described the victim as “a lost soul”, who the defendant “picked up and abused.”
This circuit and others have upheld ten year sentences for sexual abuse. See State v. Burt, 2002-0258 (La.App. 4 Cir. 10/9/02), 828 So.2d 717 (ten year sentence for first time offender); State v. Badeaux, 01-406 (La.App. 5 Cir. 9/25/01), 798 So.2d 234 (ten year sentence for sexual battery even though the defendant had no prior felony convictions); State v. Neal, 535 So.2d 757 (La.App. 2 Cir.1988); State v. Touchet, 2006-0281 (La.App. 3 Cir. 5/31/06), 931 So.2d 1264.
Based upon the facts of this case, the trial court did not impose an excessive sentence. This assignment has no merit.

CONCLUSION

For these reasons we affirm the defendant’s conviction and sentence.
AFFIRMED.

. In order to protect the victim's identity, she and her family will be referred to by their initials.

. The record does not contain a transcribed copy of the video/audio taped recording of the interview.

. The defendant is not the father of the victim's child.

. La.C.Cr.P. art. 881.1 provides in pertinent part:
Motion to reconsider sentence
A. (1) In felony cases, within thirty days following tire imposition of sentence or within such longer period as the trial court may set at sentence, the state or the defendant may make or file a motion to reconsider sentence.

. La.C.Cr.P. art. 468 provides:
Date and time
The date or time of the commission of the offense need not be alleged in the indictment, unless the date or time is essential to the offense.
If the date or time is not essential to the offense, an indictment shall not be held insufficient if it does not state the proper date or time, or if it states the offense to have been committed on a day subsequent to the finding of the indictment, or on an impossible day.
All allegations of the indictment and bill of particulars shall be considered as referring to the same date or time, unless otherwise stated.